THE NOTE INVESTMENT GROUP, INC.,   §
§
     Plaintiff,   §
§
*versus*   §  CIVIL ACTION NO. 1:12-CV-419
§
ASSOCIATES FIRST CAPITAL   §
CORPORATION, Successor-By-Merger to   §
Associates Financial Services Company, Inc.,   §
§
     Defendant.   §

## MEMORANDUM AND ORDER

Pending before the court is Defendant Associates First Capital Corporation's ("Associates") Motion for Summary Judgment (#36). Associates seeks summary judgment as to all claims asserted by Plaintiff The Note Investment Group, Inc. ("TNIG"). Having considered the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the motion should be granted.

I.  <u>Background</u>

  A.  <u>Nature of Dispute</u>

On July 26, 2012, TNIG filed this action in the 75th Judicial District Court of Liberty County, Texas, and it was removed on the basis of diversity jurisdiction on August 24, 2012. TNIG seeks damages against Associates for the alleged breach of numerous contracts pursuant to which TNIG sold partial interests ("partials") in real estate secured loans and contracts for deed to Associates. TNIG alleges that Associates breached these agreements by failing to reassign the loan or contract to TNIG following Associates' collection of the payments under the loan or contract purchased by Associates.

In this case, TNIG previously asserted the same claims against Grand Servicing Corporation ("Grand"), Associates' loan servicer, as well as claims involving other similar agreements. On May 23, 2013, however, the court dismissed Grand as a defendant in this action. *See* Docket Nos. 20 & 21 (Memorandum and Order and Order of Partial Dismissal). Thereafter, on July 10, 2013, the court ordered TNIG to file an amended pleading to narrow the scope of its complaint to include only those contracts in dispute. *See* Docket No. 25. Pursuant to that order, TNIG filed a Second Amended Complaint on July 23, 2013, asserting twenty-one breach of contract claims against Associates. *See* Docket No. 26.

On November 24, 2014, Associates filed the instant motion, wherein it seeks summary judgment as to all breach of contract claims asserted by TNIG on the basis that such claims are barred by the doctrines of res judicata and/or statute of limitations. Associates also maintains that TNIG's claims fail because there is no evidence of a contract breach on the part of Associates. TNIG did not file a response in opposition.[1]

---

[1] Although TNIG, the nonmoving party, has filed no response and has proffered no evidence in opposition to Associates' motion, summary judgment may not be awarded by default. *See Day v. Wells Fargo Bank Nat'l Ass'n*, 768 F.3d 435, 435 (5th Cir. 2014); *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 468 (5th Cir. 2010). "'A motion for summary judgment cannot be granted simply because there is no opposition, even if failure to oppose violated a local rule. The movant has the burden of establishing the absence of a genuine issue of material fact and, unless he has done so, the court may not grant the motion, regardless of whether any response was filed.'" *Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n.3 (5th Cir. 1995) (quoting *Hibernia Nat'l Bank v. Administracion Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir. 1985)); *see Owens v. Town of Delhi*, 469 F. Supp. 2d 403, 405-06 (W.D. La. 2007).

Nonetheless, the court may grant summary judgment if the movant has made a *prima facie* showing that it is entitled to such relief. *See* FED. R. CIV. P. 56(e); *see also Eversley v. MBank Dallas*, 843 F.2d 172, 174 (5th Cir. 1988); *Owens*, 469 F. Supp. 2d at 405. The nonmovant is "'under an obligation to respond . . . in a timely fashion and to place before the court all materials it wishes to have considered when the court rules on the motion.'" *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1293 n.11 (5th Cir.) (quoting *Cowgill v. Raymark Indus., Inc.*, 780 F.2d 324, 329 (3d Cir. 1985)), *cert. denied*, 513 U.S. 926 (1994). The court has "no duty to scour the record in search of a fact issue" on behalf of a party who has failed to respond. *Saddler v. Quitman Cnty. Sch. Dist.*, 278 F. App'x 412, 418 n.19 (5th Cir. 2008). The court may also accept as undisputed the facts set forth in support of the unopposed motion for summary

B.     Undisputed Facts

Commencing in mid-1999 and continuing through the late spring or early summer of 2001, Associates purchased from TNIG partial interests in loans secured by real property and partial interests in contracts for deed involving the sale of real property. A partial interest is a set number of consecutive monthly payments under a loan or a contract for deed.[2]

When TNIG sold a partial interest in a loan secured by real estate to Associates, TNIG and Associates executed a Deed of Trust Participation Agreement which governed the transaction. In most instances, when TNIG sold a partial interest to Associates in a contract for deed, TNIG and Associates executed an Agreement for Purchase of a Participation in an Installment Land Sales Contract which governed the transaction.

The Deed of Trust Participation Agreements and Agreements for Purchase of a Participation in an Installment Land Sales Contract have similar terms.[3] The Participation Agreements for both loans and contracts for deed contain various representations and warranties by TNIG, including the representation that TNIG "is vested with full and absolute title to the

_____

judgment. *See Danos v. Union Carbide Corp.*, 541 F. App'x 464, 466 (5th Cir. 2013) ("If a party fails to oppose a motion for summary judgment, then the district court is permitted to consider the facts listed in support of the motion as undisputed and grant summary judgment if those facts would entitle the movant to judgment as a matter of law."); *Jegart v. Roman Catholic Church of Diocese of Houma Thibodaux*, 384 F. App'x 398, 400 (5th Cir. 2010); *Eversley*, 843 F.2d at 174; *Ass'n of Taxicab Operators, USA v. Yellow Checker Cab Co.*, 910 F. Supp. 2d 971, 975 (N.D. Tex. 2012); *Lasewicz v. Joyce Van Lines, Inc.*, 830 F. Supp. 2d 286, 290 (S.D. Tex. 2011); Local Rule CV-56(c).

[2] For example, on or about December 6, 2000, Associates purchased from TNIG a partial consisting of the second payment through the 134th payment (a total of 133 payments) out of the remaining 239 payments under the Morehead/Burke Loan commencing with the payment due on January 13, 2001. The first of the total 240 payments under the Morehead/Burke Loan had been collected prior to the conveyance of the partial to Associates, and the remaining 106 payments following Associates' 133 payments partial represent the remainder interest owned by TNIG at the time of Associates' purchase.

[3] For ease of reference, both types of contracts are often referred to herein as "Participation Agreements."

[mortgage/contract] free and clear of all encumbrances and has the power and authority to assign and transfer the [mortgage/contract] to Associates under this Agreement." The Participation Agreements also address the distribution of proceeds upon the borrower's or buyer's prepayment of the loan or contract for deed in full.

The Participation Agreements provide that when there is a default, upon written notice to TNIG of such default, TNIG must either: (i) repurchase Associates' interest in the loan or contract within thirty days by payment to Associates of an amount equal to Associates' guaranteed minimum yield; or (ii) within thirty days, pay the amount necessary to cure the default and undertake in writing to make all future scheduled payments to Associates to the extent that the borrower under the loan or buyer under the contract fails to do so, and if TNIG fails to do either, Associates may elect to foreclose on the underlying property and to pay itself out of the proceeds the foreclosure costs, plus its guaranteed minimum yield and the sum of $500.00. Unless there is an excess following the satisfaction of the foregoing, TNIG is entitled to no portion of the proceeds from the foreclosure.

The Deed of Trust Participation Agreement form provides that "[s]hould Borrower or someone on behalf of Borrower make all payments owed to Associates either pursuant to the payment schedule or otherwise, then Associates shall execute an absolute assignment of the Mortgage and Note to owner . . . ." The Agreement for Purchase of a Participation in an Installment Land Sales Contract form does not contain a provision expressly requiring the assignment upon a payout of the partial.

TNIG purchased the loans in which it sold partials to Associates from the person or entity that was the payee under the note, the beneficiary under the deed of trust, and the seller of the

property to the borrower. TNIG purchased the contracts for deed in which it sold partials to Associates from the seller identified in the contract for deed who sold the property to the buyer/obligor.

Unbeknownst to Associates, when TNIG purchased the loans and contracts for deed in which a partial was conveyed to Associates, in many cases, TNIG agreed to pay for the loan or contract in two installments. Under this scenario, TNIG would pay the seller the installment of the purchase price for the loan or contract out of the funds paid by Associates to TNIG to purchase the partial, and TNIG would commit to pay the seller a second installment representing the remainder of the purchase price. The second installment would be due on the three-year anniversary of the sale of the loan or contract to TNIG unless: (i) the loan or contract went into default within the three-year period, in which case TNIG had no obligation to pay the second installment; or (ii) the loan or contract was paid in full, in which case TNIG would pay the seller the second installment out of the proceeds paid by Associates to TNIG over and above the amount of Associates' guaranteed minimum yield for Associates' partial.

On some occasions, Associates agreed to buy all of the remaining payments under a loan or contract for deed in which Associates had purchased a partial at some point following the purchase of the partial. The decision to do so, however, was made by Associates on a case-by-case basis, and the timing of when Associates elected to extend an offer to purchase such a remainder or to accept or make a counter-offer varied.

In November 2000, Citigroup Inc. ("Citigroup") acquired Associates, and on May 24, 2001, Citigroup notified sellers such as TNIG that, effective immediately, Associates would no longer purchase seller-financed loans or contracts for deed.

For some of the loans and contracts in which TNIG sold a partial to Associates, TNIG defaulted under its obligation to pay TNIG's seller the second installment of the purchase price for the loan or contract and, as a result, some of TNIG's sellers (*e.g.*, Speed Investments, Inc. ("Speed")) threatened to sue TNIG. In at least one case, a seller sued TNIG for unpaid second installments. According to Associates, TNIG responded to the demands and claims of TNIG's sellers by asserting that Associates had orally agreed: (i) to purchase the remainder interest in all loans and contracts for deed in which TNIG sold a partial to Associates and which did not go into default within the first thirty-six months; and (ii) to pay a "second funding" installment to TNIG for that purchase, with TNIG claiming that because Associates had not paid the purchase price for the remainder, TNIG was unable to pay the second installment.

    1.       <u>The Agreements at Issue</u>

        a.       <u>Brownell</u>

Pursuant to a Participation Agreement dated December 28, 2000 (the "Brownell Participation Agreement"), TNIG sold Associates a partial (the "Brownell Partial") consisting of 116 payments out of 232 remaining payments under a loan (the "Brownell Loan") evidenced by a real estate lien note dated April 21, 2000, pursuant to which Clarence and Sandra Brownell promised to pay Komar Enterprises, Inc. ("Komar") the original principal amount of $17,490.00.

By letter dated April 16, 2001, TNIG received notice of: (i) defaults under the Brownell Loan; (ii) Associates' intention to foreclose on the property securing the Brownell Loan (the "Brownell Property"); and (iii) TNIG's obligation either to repurchase the Brownell Loan or to cure the defaults under the loan within thirty days. After TNIG failed to repurchase the Brownell Loan or cure the defaults, the Brownell Property was sold at foreclosure on December 4, 2001.

Associates purchased the property as the high bidder and, on November 29, 2001, it charged off $13,466.00 of the principal portion of the partial.

                    b.      <u>Joshua Brooke</u>

Pursuant to a Participation Agreement dated October 24, 2000 (the "Joshua Brooke Participation Agreement"), TNIG sold a partial (the "Joshua Brooke Partial") to Associates. It consisted of 136 payments out of the 239 remaining payments under a loan (the "Joshua Brooke Loan") evidenced by a real estate lien note dated October 13, 2000, pursuant to which Joshua R. Brooke promised to pay Metro Land and Investment Co. ("Metro") the original principal amount of $24,100.00.

The Joshua Brooke Loan was refinanced by the borrower, and TNIG's seller, Metro, received the full payoff for the Joshua Brooke Loan on or about January 2, 2001, inclusive of the amounts owed to Associates for its partial and the excess belonging to TNIG.

As a result of the refinance and the payoff of the Joshua Brooke Loan received by Metro, the borrower ceased making payments to Associates. After numerous discussions between Associates and TNIG regarding the problem, Greg Hickman ("Hickman") of TNIG spoke with Joseph McConnely of Metro. Hickman requested and obtained a payoff quote from Associates so that Hickman could facilitate Metro's payment to Associates in full for Associates' partial. After Associates provided a payoff quote to Hickman on February 27, 2001, Associates received from Metro on March 5, 2001, only the amount owed to Associates for the Joshua Brooke Partial and no portion of any remainder belonging to TNIG.

In January and February 2001, Associates and TNIG communicated numerous times regarding Metro's receipt of the full payoff for the Joshua Brooke Loan, including having

discussions about the portion of the payoff owed to Associates and the excess funds belonging to TNIG.[4]  In those communications, Hickman of TNIG said that he would get any problems "cleared up" and would get Associates its money.

The title report obtained by the lender in connection with the refinance of the Joshua Brooke Loan was effective as of October 24, 2000, prior to the recording of the assignment of the deed of trust from Metro to TNIG and the recording of the assignment of the deed of trust from TNIG to Associates.  Therefore, the lender caused the payoff amount to be sent to Metro, which was the record beneficiary of the deed of trust as of the date of the title report.

c.  Brooks

Pursuant to a Participation Agreement dated February 7, 2000 (the "Brooks Participation Agreement"), TNIG sold Associates a partial (the "Brooks Partial") consisting of 150 payments out of 173 remaining payments under a loan (the "Brooks Loan") evidenced by a note dated September 20, 1999, pursuant to which Jack and Mary Brooks promised to pay Bruce and Debbie Wacasey the original principal amount of $28,100.00.

The property securing the Brooks Loan (the "Brooks Property") was sold at foreclosure on June 3, 2008, which Associates purchased as the high bidder.  The proceeds from the subsequent March 9, 2010, REO sale of the Brooks Property were insufficient to satisfy Associates' guaranteed minimum yield or even the principal portion of its partial.

---

[4] Associates references the following:  (i) telephone calls on January 29, 2001, and February 9, 2001; (ii) two telephone calls on February 9, 2001; (iii) a message left for TNIG on February 12, 2001; (iv) a telephone call on February 13, 2001; (v) messages left for TNIG on February 16 and February 20, 2001; (vi) two telephone calls on February 21, 2001, a call on February 23, 2001, and a message left for TNIG on February 27, 2001.

d.    <u>Carrillo</u>

Pursuant to a Participation Agreement, dated September 1, 2000 (the "Carrillo Participation Agreement"), TNIG sold Associates a partial (the "Carrillo Partial") consisting of 180 payments out of 357 remaining payments under a loan (the "Carrillo Loan") evidenced by a promissory note dated November 15, 1999, executed by Ociel and Diane Carrillo, who promised to pay Oaks at O.S.R., LLC ("Oaks") the original principal amount of $24,207.00.

By letter dated November 9, 2004, TNIG received notice of: (i) defaults under the Carrillo Loan; (ii) Associates' intention to foreclose on the property securing the Carrillo Loan (the "Carrillo Property"); and (iii) TNIG's obligation to repurchase the Carrillo Loan or cure its defaults within thirty days. After TNIG failed repurchase the Carrillo Loan or cure the defaults, Associates charged off the loan on January 31, 2005, on the basis that the value of the Carrillo Property was insufficient to satisfy prior liens against it, the cost of foreclosure, and Associates' guaranteed minimum yield.

e.    <u>Ellenberg</u>

Pursuant to a Participation Agreement dated December 28, 2000 (the "Ellenberg Participation Agreement"), TNIG sold a partial (the "Ellenberg Partial") to Associates consisting of 120 payments out of the 228 remaining payments under a loan (the "Ellenberg Loan") evidenced by a real estate lien note dated January 14, 2000, pursuant to which Richard Ellenberg promised to pay Komar the original principal amount of $17,490.00.

The property securing the Ellenberg Loan (the "Ellenberg Property") was sold at foreclosure in August 2001. Associates purchased the property as the high bidder, but the proceeds from the sale were insufficient to satisfy the principal portion of Associates' partial.

f.      Ferrera

Pursuant to a Participation Agreement dated December 27, 1999 (the "Ferrera Participation Agreement"), TNIG sold Associates a partial (the "Ferrera Partial") consisting of 151 payments out of 299 remaining payments under a loan (the "Ferrera Loan") evidenced by a real estate lien note dated December 21, 1999, pursuant to which Franklin Todd Ferrera promised to pay ADCO Investments, Inc. the original principal amount of $26,900.00.

By letter dated March 13, 2001, TNIG received notice of:  (i) defaults under the Ferrera Loan; (ii) Associates' intention to foreclose on the property securing the Ferrera Loan (the "Ferrera Property"); and (iii) TNIG's obligation either to repurchase the Ferrera Loan or cure the defaults under the loan within thirty days.  When TNIG failed to repurchase the Ferrera Loan or cure the defaults, Associates accepted a deed in lieu of the Ferrera Property which was recorded in July 2001.  The proceeds from the subsequent sale of the Ferrera Property were insufficient to satisfy the principal portion of Associates' partial.

g.      Fischer

Pursuant to a Participation Agreement dated May 31, 2000 (the "Fischer Participation Agreement"), TNIG sold Associates a partial (the "Fischer Partial") consisting of 155 payments out of 356 remaining payments under a contract for deed (the "Fischer Contract") dated January 30, 2000, pursuant to which Barbara Fischer agreed to purchase from Southern Horizons Development, Inc. certain real property in Liberty County, Texas,[5] for $26,900.00.[6]

---

[5] Although the complaint and the Brokers Price Opinion identifies the Fischer property as located in Liberty County, Texas, ¶ 11 of the affidavit of Jon Runnels states that it is located in Montgomery County, Texas.

[6] The contract for deed with regard to this property shows the sale price as $26,500.00.

By letter dated November 1, 2004, TNIG received notice of: (i) defaults under the Fischer Contract; (ii) Associates' intention to foreclose on the property which is the subject of the Fischer Contract (the "Fischer Property"); and (iii) TNIG's obligation to repurchase the Fischer Contract or cure its defaults within thirty days. After TNIG failed to repurchase the contract or cure the defaults, Associates charged it off on November 21, 2004, on the basis that the value of the Fischer Property was insufficient to satisfy the cost of the foreclosure and Associates' guaranteed minimum yield.

h. Foster/Reed

Pursuant to a Participation Agreement dated November 14, 2000 (the "Foster/Reed Participation Agreement"), TNIG sold Associates: (i) a partial (the "Foster Partial") consisting of 116 payments out of 295 remaining under a loan (the "Foster Loan") evidenced by a real estate lien note dated July 10, 2000, pursuant to which Michael and Rennetta Foster promised to pay Komar the original principal amount of $28,940.00; and (ii) a partial (the "Reed Partial") consisting of 120 payments out of 294 remaining under a loan (the "Reed Loan") evidenced by a real estate lien note dated May 15, 2000, pursuant to which Daniel Reed and Paula Thibodeaux promised to pay Komar the original principal amount of $21,490.00.

By letter dated November 6, 2002, TNIG received notice of: (i) defaults under the Foster Loan; (ii) Associates' intention to foreclose on the property securing the Foster Loan (the "Foster Property"); and (iii) TNIG's obligation to repurchase the Foster Loan or cure its defaults within thirty days. When TNIG failed either to repurchase the Foster Loan or cure its defaults, the Foster Property was sold at foreclosure in February 2003. Associates purchased the property as

the high bidder, but the proceeds from that sale were insufficient to satisfy Associates' guaranteed minimum yield or even the principal portion of its partial.

By letter dated July 20, 2004, TNIG received notice of: (i) defaults under the Reed Loan; (ii) Associates' intention to foreclose on the property securing the Reed Loan (the "Reed Property"); and (iii) TNIG's obligation either to repurchase the Reed Loan or cure its defaults within thirty days. After TNIG failed to do either, Associates charged off the loan on January 13, 2005, as the value of the Reed Property was insufficient to satisfy the cost of the foreclosure and Associates' guaranteed minimum yield.

i.    Fuentes-O'Riley-Martin-Wellik-Sherman

Pursuant to a Participation Agreement dated April 20, 2000 (the "Fuentes-O'Riley-Martin-Wellik-Sherman Participation Agreement"), TNIG sold to Associates: (i) a partial (the "Fuentes Partial') consisting of 192 payments out of 235 remaining under a contract for deed ("the Fuentes Contract") dated December 7, 1999, pursuant to which Carlos and Luz Fuentes agreed to purchase from Conroe Investors, Ltd. ("Conroe") real property in Montgomery County, Texas, for $30,600.00; (ii) a partial (the "O'Riley Partial") consisting of ninety-four payments out of 174 remaining under a contract for deed (the "O'Riley Contract) dated April 25, 1999, pursuant to which Rose O'Riley agreed to purchase from Conroe real property in Montgomery County, Texas, for $6,500.00; (iii) a partial (the "Wellik Partial") consisting of 180 payments out of 237 remaining under a contract for deed (the "Wellik Contract") dated January 14, 1999, pursuant to which Joyce Wellik agreed to purchase from Conroe certain real property in Montgomery County, Texas, for $17,100.00; (iv) a partial (the "Martin Partial") consisting of 198 payments out of 239 remaining under a contract for deed (the "Martin Contract") dated January 18, 2000, pursuant to

which Monica and Leslie Martin, Jr. agreed to purchase from Conroe certain real property in Montgomery County, Texas, for $24,600.00; and (v) a partial (the "Sherman Partial") consisting of 175 payments out of 239 remaining under a contract for deed (the "Sherman Contract") dated November 27, 1999, pursuant to which James and Sandra Sherman agreed to purchase from Conroe real property in Montgomery County, Texas, for $30,600.00.

The property which is the subject of the Wellik Contract was sold at a foreclosure sale in August 2001. The proceeds from that sale were insufficient to satisfy the principal portion of Associates' partial.

By letter dated March 28, 2003, TNIG received notice of: (i) defaults under the O'Riley Contract; (ii) Associates' intention to foreclose on the property which is the subject of the O'Riley Contract (the "O'Riley Property"); and (iii) TNIG's obligation either to repurchase the O'Riley Contract or cure its defaults within thirty days. After TNIG failed to repurchase the O'Riley Contract or cure the defaults, the O'Riley Property was sold at a foreclosure sale on November 2, 2004. Associates purchased the property as the high bidder, but the proceeds from the sale of the O'Riley Property were insufficient to satisfy Associates' guaranteed minimum yield or even the principal portion of its partial.

By letter dated January 28, 2002, TNIG received notice of: (i) defaults under the Martin Contract; (ii) Associates' intention to foreclose on the property which is the subject of the Martin Contract (the "Martin Property"); and (iii) TNIG's obligation either to repurchase the Martin Contract or cure its defaults within thirty days. After TNIG failed to repurchase the contract or cure the defaults, Associates charged off the contract because the value of the property was insufficient to satisfy the cost of the foreclosure and Associates' guaranteed minimum yield.

j.     <u>Hutton</u>

Pursuant to a Participation Agreement dated March 14, 2001 (the "Hutton Participation Agreement"), TNIG sold Associates a partial (the "Hutton Partial") consisting of 138 payments out 360 remaining under a contract of sale and purchase (the "Hutton Contract") dated September 26, 2000, pursuant to which Janna Hutton agreed to purchase from Oak Ridge Development, LLC real property in Williamson County, Texas, for $39,950.00.

The property which is the subject of the Hutton Contract was sold at foreclosure in October 2001, which Associates purchased as the high bidder. The proceeds from the sale of the Hutton Property and additional amounts collected were insufficient to satisfy the principal portion of Associates' partial.

k.     <u>Mayberry</u>

Pursuant to a Participation Agreement dated April 4, 2001 (the "Mayberry Participation Agreement"), TNIG sold Associates a partial (the "Mayberry Partial") consisting of 136 payments out of 252 remaining under a contract for deed (the "Mayberry Contract") dated February 12, 2001, pursuant to which Sasha Mayberry agreed to purchase from Oaks certain real property in Brazos County, Texas, for $24,900.00.

By letter dated January 15, 2002, TNIG received notice of: (i) defaults under the Mayberry Contract; (ii) Associates' intention to foreclose on the property which is the subject of the Mayberry Contract ("Mayberry Property); and (iii) TNIG's obligations to repurchase the Mayberry Contract or cure its defaults within thirty days. TNIG, however, failed to repurchase the Mayberry Contract or cure the defaults. As a result, Associates charged off the Mayberry

Contract, because the value of the Mayberry Property was insufficient to satisfy the cost of the foreclosure and Associates' guaranteed minimum yield.

l.    Morehead/Burke

Pursuant to a Participation Agreement dated December 6, 2000 (the "Morehead/Burke Participation Agreement"), TNIG sold Associates a partial (the "Morehead/Burke Partial") consisting of 133 payments out of 239 remaining under a loan (the "Morehead/Burke Loan") evidenced by a real estate lien note dated November 13, 2000, pursuant to which Loyd Morehead and Shelly R. Burke promised to pay Metro the original principal amount of $24,346.00. Although TNIG was notified of title issues with the Morehead/Burke Loan in February 2002, TNIG failed to repurchase the loan or cure the title issues. Therefore, Associates charged off the Morehead/Burke Loan on June 5, 2002, due to the absence of a valid lien and other title problems caused by TNIG's seller.

m.    Noonan

Pursuant to a Participation Agreement dated February 16, 2000 (the "Noonan Participation Agreement"), TNIG sold Associates a partial (the "Noonan Partial") consisting of 174 payments out of 236 remaining under a loan (the "Noonan Loan") evidenced by a real estate lien note dated October 7, 1999, pursuant to which Richard M. Noonan promised to pay San Jo Cove, Inc. $15,400.00.

By letter dated October 8, 2008, TNIG received notice of: (i) defaults under the Noonan Loan; (ii) Associates' intention to foreclose on the property securing the Noonan Loan (the "Noonan Property"); and (iii) TNIG's obligation either to repurchase the Noonan Loan or cure its defaults within thirty days. After TNIG failed to do either, Associates charged off the loan

because the value of the Noonan Property was insufficient to satisfy the cost of the foreclosure and Associates' guaranteed minimum yield.

n.    Rodriguez

Pursuant to a Participation Agreement dated December 28, 2000 (the "Rodriquez Participation Agreement"), TNIG sold Associates a partial (the "Rodriguez Partial") consisting of 132 payments out of 231 remaining under a loan (the "Rodriguez Loan") evidenced by a note pursuant to which Migual and Jovita Rodriguez promised to pay Komar $18,490.00.

By letter dated April 16, 2001, TNIG received notice of: (i) defaults under the Rodriguez Loan; and (ii) TNIG's obligation to repurchase the Rodriguez Loan or cure its defaults within thirty days. TNIG, however, failed to repurchase the Rodriguez Loan or cure its defaults. Consequently, the property securing the Rodriguez Loan (the "Rodriguez Property") was sold at a foreclosure sale in August 2001, which Associates purchased as the high bidder. Thereafter, Associates charged off $15,093.00 of the principal portion of its partial.

o.    Underwood

Pursuant to a Participation Agreement dated April 28, 2000 (the "Underwood Participation Agreement"), TNIG sold Associates a partial (the "Underwood Partial") consisting of 139 payments out of 238 remaining under a loan (the "Underwood Loan") evidenced by a promissory note dated March 17, 2000, pursuant to which Francis Denise Underwood promised to pay KMBS Joint Venture the original principal amount $19,600.00.

By letter dated April 9, 2005, TNIG received notice of: (i) defaults under the Underwood Loan; (ii) Associates' intent to foreclose on the property securing the Underwood Loan (the "Underwood Property"); and (iii) TNIG's obligation to repurchase the Underwood Loan or cure

its defaults within thirty days. When TNIG failed to do either, Associates charged off the Underwood Loan on June 25, 2005, as the value of the Underwood Property was insufficient to satisfy the probate cost necessitated by the borrower's death, the foreclosure costs, and Associates' guaranteed minimum yield.

p.  <u>White</u>

Pursuant to a Participation Agreement dated May 30, 2001, TNIG purchased from Speed a partial (the "TNIG White Partial") consisting of 116 payments out of 239 remaining payments, commencing with a payment due on June 15, 2001, under a loan (the "White Loan") evidenced by a note dated April 9, 2001, pursuant to which Ronnie W. White promised to pay Speed $44,500.00. Pursuant to a Participation Agreement dated May 30, 2001 (the "White Participation Agreement"), TNIG sold Associates a partial (the "White Partial") consisting of the 115 remaining payments under the White Loan, commencing with a payment due on July 15, 2001, such that TNIG, after collecting one payment, sold the entirety of its interest in the White Loan (*i.e.*, the TNIG White Partial) to Associates. Thus, TNIG had no interest in the White Loan, and Speed, which had only transferred a partial to TNIG, was the owner of the remaining 123 payments under the White Loan.

Associates collected the last of its 115-payment partial in the White Loan on February 15, 2010. After determining that Speed, not TNIG, owned the remainder in the White Loan, Associates endorsed the note evidencing the White Loan to Speed and sent an assignment of the deed of trust securing the White Loan to Speed together with a check in the amount of $530.63 representing the proceeds received by Associates in excess of its entitlement for the White Partial.

2. State Court Proceedings

On October 18, 2006, TNIG filed suit against Associates in a case styled *The Note Investment Group, Inc. v. Associates First Capital Corporation, successor by merger to Associates Financial Services Company, Inc.*, Cause No. 06-08-07846-CV, in the 9th Judicial District Court of Montgomery County, Texas (the "Initial Suit"), by filing Plaintiff's Original Petition (the "Initial Petition").

In the Initial Petition, TNIG acknowledged receiving a June 1, 2005, letter from Speed demanding second installment payments totaling $19,000 in connection with TNIG's purchase of four loans from Speed in which partials had been sold to Associates. It also acknowledged being sued on October 21, 2005, by E. B. Peavy Construction, Inc., one of TNIG's sellers, for $19,984.00 in unpaid second installments owed by TNIG for contracts for deed in which partials had been sold by TNIG to Associates. In the Initial Petition, TNIG asserted claims against Associates for violations of the Deceptive Trade Practices Act ("DTPA") and breach of contract. The claims stemmed from Associates' alleged failure to pay TNIG the price to purchase the remainder interests in over 160 loans and contracts in which TNIG sold a partial to Associates and which were listed on Exhibit "A" attached to the Initial Petition.

The list of loans and contracts attached as Exhibit "A" to the Initial Petition includes the Joshua Brooke Loan, the Carrillo Loan, the Ellenberg Loan, the Ferrera Loan, the Fischer Contract, the Fuentes Contract, the Foster Loan, the Hutton Contract, the Martin Contract, the Mayberry Contract, the Morehead/Burke Loan, the Noonan Loan, the Reed Loan, the Sherman Contract, the Underwood Loan, the Wellik Contract, the White Loan.

On October 14, 2009, TNIG nonsuited the Initial Suit, and on December 21, 2009, TNIG refiled it under Cause No. 09-12-12262 in the 9th Judicial District Court of Montgomery County, Texas (the "Montgomery County Suit"). The Montgomery County Suit initially involved only TNIG's claims for breach of contract, violations of the DTPA, fraud, conversion, and unjust enrichment arising out of TNIG's allegation that Associates failed to pay a "second funding" installment under an alleged agreement governing all of Associates' purchases of partials from TNIG. This alleged agreement, according to TNIG, obligated Associates to purchase the remainder of each loan or contract in which Associates acquired a partial from TNIG by paying a second installment thirty-six months after the partial purchase, provided that the loan or contract did not go into default within that period.

In the Montgomery County Suit, Associates moved for summary judgment with respect to TNIG's DTPA claim. In response, TNIG filed an Amended Petition which excluded its DTPA claim. Thereafter, on May 13, 2011, Associates filed a motion for summary judgment with respect to all of TNIG's remaining claims. On June 22, 2011, just prior to a hearing scheduled on Associates' motion, TNIG filed its Third Amended Original Petition (the "Third Petition"), wherein TNIG averred that Associates "breached its obligations to [TNIG] under the Deed of Trust Participation Agreements and/or the Agreements for Purchase of a Participation in an Installment Land Sales Contract with regard to a majority of the transactions set forth on Exhibit 'A'" and that Associates breached each of the Participation Agreements. Exhibit "A" attached to the Third Petition lists by borrower/buyer name numerous loans and contracts which are the subject of TNIG's claims for breach of the individual Participation Agreements. Exhibit "A" to the Third Petition includes the Joshua Brooke Loan, the Brownell Loan, the Carrillo Loan, the

Ellenberg Loan, the Ferrera Loan, the Fischer Contract, the Foster Loan, the Fuentes Contract, the Hutton Contract, the Martin Contract, the Mayberry Contract, the Morehead/Burke Loan, the Noonan Loan, the Reed Loan, the Rodriquez Loan, the Sherman Contract, the Underwood Loan, and the Wellik Contract.

Associates' motion for summary judgment was initially denied. Prior to trial, however, on January 20, 2012, the state court reconsidered the motion and granted summary judgment in favor of Associates with respect to all of TNIG's claims, save and except the claims for breach of contract and conversion as to the individual Participation Agreements. At the time Associates' motion for summary judgment was heard in the Montgomery County Suit, claims asserted by TNIG were pending with respect to the Brownell Loan, the Carrillo Loan, the Ellenberg Loan, the Fischer Contract, the Foster Loan, the Fuentes Contract, the Hutton Contract, the Martin Contract, the Mayberry Contract, the Morehead/Burke Loan, the Noonan Loan, the Reed Loan, the Rodriguez Loan, the Sherman Contract, the Underwood Loan, and the Wellik Contract.

On January 20, 2012, TNIG's counsel in the Montgomery County Suit provided a list (the "the Montgomery County Suit Damage Calculation") to Associates' counsel of the "'per file' calculation of the TNIG remainder interest under the [Deed of Trust Participation Agreements] assuming that there was no agreement for a second funding" (*i.e.*, the damages for TNIG's claims for breach of the individual Participation Agreements and for conversion arising out of the individual Participation Agreements). The Montgomery County Suit Damage Calculation includes the damages calculated by TNIG for the breach of the Participation Agreements for the Joshua Brooke Loan, the Brownell Loan, the Carrillo Loan, the Ellenberg Loan, the Ferrera Loan, the Fischer Contract, the Foster Loan, the Fuentes Contract, the Hutton Contract, the Martin

Contract, the Mayberry Contract, the Morehead/Burke Loan, the Noonan Loan, the Reed Loan, the Rodriguez Loan, the Sherman Contract, the Underwood Loan, and the Wellik Contract.

In interrogatories propounded in this case, TNIG was asked to provide a damage calculation for its breach of contract claims with regard to each of the twenty-one partials. TNIG responded with a list that reflects a damage formula for each of the twenty-one partials which is identical to the formula reflected in the Montgomery County Suit Damage Calculation, and for the eighteen partials listed in both TNIG's Interrogatory Answers in this case and in the Montgomery County Suit Damage Calculation, the damage amounts for fifteen of the eighteen match, and the differences for the remaining three are nominal.

At the outset of the trial in the Montgomery County Suit, TNIG filed a Notice of Partial Nonsuit Without Prejudice on January 23, 2012, pursuant to which TNIG nonsuited only its breach of contract claims and not its conversion claims with respect to "those Deed of Trust Participation Agreements and/or the Agreements for Purchase of a Participation in an Installment Land Sales Contract for and only for those transactions set forth on the attached Exhibit 'A.'" The list attached as Exhibit "A" to the Notice of Partial Nonsuit includes the Ferrera Loan, the Rodriguez Loan, the Fuentes Contract, the Martin Contract, the O'Riley Contract, the Sherman Contract, the Wellik Contract, the Joshua Brook Loan, the Foster Loan, the Morehead/Burke Loan, the Brownell Loan, the Ellenberg Loan, the Hutton Contract, the Mayberry Contract, and the White Loan.

On January 25, 2012, the trial court in the Montgomery County Suit declared a mistrial, dismissed the jury, and advised the parties that the court believed many of TNIG's remaining claims for breach of the individual Participation Agreements and conversion were time-barred.

Therefore, the court directed Associates to move for summary judgment as to those claims. The trial was reset for July 10, 2012.

On June 1, 2012, Associates moved for summary judgment on twenty-six of the individual Participation Agreements identified by TNIG. On the first day of trial, July 10, 2012, the court announced that it was granting in part and denying in part Associates' motion for summary judgment and ordered that TNIG take nothing by way of its breach of contract and conversion claims for twenty-four of the twenty-six partials which were the subject of that motion.

The same day, just prior to opening statements, TNIG, through counsel, announced that it was nonsuiting all of its breach of contract claims with respect to the individual Participation Agreements for all partials, save and except twenty-seven partials listed by TNIG's counsel and, although TNIG's carve-out list includes three partials (Porter, Scherer and Marshall) which were included in TNIG's Original Petition and/or in the First Amended Complaint in this case, none of the twenty-one partials remaining at issue in this case was included in TNIG's list.

Following the presentment of the evidence, the state court entered a final judgment on August 24, 2012, wherein it determined that TNIG was entitled to only $131,876.85 out of the $174,562.50 Associates had tendered to TNIG and which had been deposited into the registry of the court. The court reduced TNIG's award to $65,938.43 and awarded Associates $65,938.42 for attorneys' fees. On November 16, 2012, the court entered Findings of Fact and Conclusions of Law, concluding that Associates did not breach any of the individual Participation Agreements or convert any property of TNIG's.

II.    <u>Analysis</u>

A.    <u>Summary Judgment Standard</u>

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Technical Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 407 (5th Cir. 2012); *QBE Ins. Corp. v. Brown & Mitchell, Inc.*, 591 F.3d 439, 442 (5th Cir. 2009).  Where a defendant moves for summary judgment on the basis of an affirmative defense and, thus, bears the ultimate burden of persuasion, "evidence must be adduced supporting each element of the defense and demonstrating the lack of any genuine issue of material fact with regard thereto." *Terrebone Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 877 (5th Cir. 2002); *see United States v. Renda Marine, Inc.*, 667 F.3d 651, 659 (5th Cir. 2012), *cert. denied*, 133 S. Ct. 1800 (2013); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1074 (5th Cir.), *cert. denied*, 522 U.S. 915 (1997).  To warrant judgment in its favor, the movant "'"must establish beyond peradventure *all* of the essential elements of the defense."'" *Martin v. Alamo Cmty. Coll. Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (emphasis in original) (quoting *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (quoting *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986)); *accord Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010).

"A fact is material only if its resolution would affect the outcome of the action . . . ." *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009); *accord Poole v. City of Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012); *Cooper Tire & Rubber Co. v. Farese*, 423 F.3d 446, 454 (5th Cir. 2005). "'Factual disputes that are irrelevant or unnecessary will not be counted.'" *Tiblier v. Dlabal*, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue is '*genuine*' if it is real and substantial, as opposed to merely formal, pretended, or a sham." *Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001) (emphasis in original). The moving party, however, need not negate the elements of the nonmovant's case. *See Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010); *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)); *Millennium Petrochemicals, Inc. v. Brown & Root Holdings, Inc.*, 390 F.3d 336, 339 (5th Cir. 2004).

Once a proper motion has been made, the nonmoving party may not rest upon mere allegations or denials in the pleadings but must present affirmative evidence, setting forth specific facts, to demonstrate the existence of a genuine issue for trial. *Celotex Corp.*, 477 U.S. at 322 n.3 (quoting FED. R. CIV. P. 56(e)); *Anderson*, 477 U.S. at 256; *Distribuidora Mari Jose, S.A. de C.V. v. Transmaritime, Inc.*, 738 F.3d 703, 706 (5th Cir. 2013); *Bayle*, 615 F.3d at 355. "[T]he court must review the record 'taken as a whole.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see Riverwood Int'l Corp. v. Emp'rs Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005). All the evidence must be construed in the light most favorable to the nonmoving party, and the court will not weigh the evidence or evaluate its credibility. *Reeves*, 530 U.S. at

150; *Downhole Navigator, LLC v. Nautilus Ins. Co.*, 686 F.3d 325, 328 (5th Cir. 2012); *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 615 (5th Cir. 2009). The evidence of the nonmovant is to be believed, with all justifiable inferences drawn and all reasonable doubts resolved in its favor. *Groh v. Ramirez*, 540 U.S. 551, 562 (2004) (citing *Anderson*, 477 U.S. at 255); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 192 (5th Cir. 2011), *cert. denied*, 133 S. Ct. 22 (2012); *Tradewinds Envtl. Restoration, Inc. v. St. Tammany Park, LLC*, 578 F.3d 255, 258 (5th Cir. 2009).

Nevertheless, "only reasonable inferences in favor of the nonmoving party can be drawn from the evidence." *Mills v. Warner-Lambert Co.*, 581 F. Supp. 2d 772, 779 (E.D. Tex. 2008) (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 469 n.14 (1992)); *accord Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012). "If the [nonmoving party's] theory is . . . senseless, no reasonable jury could find in its favor, and summary judgment should be granted." *Eastman Kodak Co.*, 504 U.S. at 468-69; *accord Shelter Mut. Ins. Co. v. Simmons*, 543 F. Supp. 2d 582, 584-85 (S.D. Miss.), *aff'd*, 293 F. App'x 273 (5th Cir. 2008). "Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012); *see Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990); *accord Stauffer v. Gearhart*, 741 F.3d 574, 581 (5th Cir. 2014); *Firman v. Life Ins. Co. of N. Am.*, 684 F.3d 533, 538 (5th Cir. 2012); *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010).

Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to its case on which it bears the burden of proof at

trial. *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993); *Celotex Corp.*, 477 U.S. at 322;

*EMCASCO Ins. Co. v. Am. Int'l Specialty Lines Ins. Co.*, 438 F.3d 519, 523 (5th Cir. 2006);

*Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 110 (5th Cir. 2005); *Patrick v.*

*Ridge*, 394 F.3d 311, 315 (5th Cir. 2004). "[W]here the nonmoving party fails to establish the

existence of an element essential to that party's case, and on which that party will bear the burden

of proof at trial, no genuine issue of material fact can exist." *Apache Corp. v. W&T Offshore,*

*Inc.*, 626 F.3d 789, 793 (5th Cir. 2010) (internal quotations omitted). "In such a situation, there

can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an

essential element of the nonmoving party's case necessarily renders all other facts immaterial."

*Celotex Corp.*, 477 U.S. at 322-23.

B.    Res Judicata

Associates first asserts that summary judgment is appropriate as to all of TNIG's breach

of contract claims on the basis of res judicata. "Res judicata, also known as claim preclusion,

prevents the relitigation of a claim or cause of action that was adjudicated and resolved by a final

judgment, as well as all related matters that with the use of diligence could or should have been

litigated in the prior suit." *Hill v. TX-AN Anesthesia Mgmt., LLP*, 443 S.W.3d 416, 424 (Tex.

App.—Dallas 2014, no pet.)) (citing *Citizens Ins. Co. of Am. v. Daccach*, 217 S.W.3d 430, 449

(Tex. 2007)); *McNeil Interests, Inc. v. Quisenberry*, 407 S.W.3d 381, 387 (Tex. App.—Houston

[14th Dist.] July 9, 2013, no pet.).[7] "When a prior judgment is offered in subsequent litigation in

---

[7] "In determining whether res judicata bars a claim, federal courts 'give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered.'" *Jackson v. Deutsche Bank Trust Co.*, 583 F. App'x 417, 417-18 (5th Cir. 2014) (quoting *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984)); *Adar v. Smith*, 639 F.3d 146, 153 n.2 (5th Cir. 2011); *Van Duzer v. U.S. Bank Nat'l Ass'n*, 995 F. Supp. 2d 673, 685 (S.D. Tex. 2014), *aff'd*, 582 F. App'x 279 (5th Cir. 2014).

which there is identity of parties, issues, and subject matter, such judgment is treated as an absolute bar to retrial of claims pertaining to the same cause of action on the theory that they have merged into the judgment." *Nat'l Union Fire Ins. Co. v. John Zink Co.*, 972 S.W.2d 839, 846 (Tex. App.—Corpus Christi 1998, no writ); *see Fed. Home Loan Mortg. Corp. v. Pham*, ___ S.W.3d ___, No. 14-13-00109, 2014 WL 5034638, at *3 (Tex. App.—Houston [14th Dist.] Oct. 9, 2014, no pet.); *Valley Forge Ins. Co. v. Ryan*, 824 S.W.2d 236, 238 (Tex. App.—Fort Worth 1992, no writ). Res judicata requires: "(1) a prior final judgment on the merits by a court of competent jurisdiction; (2) identity of parties or those in privity with them; and (3) a second action based on the same claims as were raised or could have been raised in the first action." *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 652 (Tex. 1996); *Conley v. Comstock Oil & Gas, LP*, 356 S.W.3d 755, 764 (Tex. App.—Beaumont Dec. 15, 2011, no pet.).

"[T]he doctrine of res judicata is based upon [general policies] which include: promotion of judicial economy and the stability of judgments; and the prevention of vexatious litigation, double recoveries, and inconsistent judgments." *Valley Forge Ins. Co.*, 824 S.W.2d at 238; *see Barr v. Resolution Trust Corp. ex rel. Sunbelt Fed. Sav.*, 837 S.W.2d 627, 629 (Tex. 1992); *McNeil Interests, Inc.*, 407 S.W.3d at 387; *Welch v. Hrabar*, 110 S.W.3d 601, 609 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Under the transactional approach—which is followed in Texas—"a subsequent suit is barred if it arises out of the same subject matter as the prior suit, and that subject matter could have been litigated in the prior suit." *Daccach*, 217 S.W.3d at 449 (citing *Barr*, 837 S.W.2d at 631)); *Ward v. Stanford*, 443 S.W.3d 334, 359 (Tex. App.—Dallas 2014, no pet.). "A determination of what constitutes the subject matter of a suit necessarily requires an examination

of the factual basis of the claim or claims in the prior litigation" as well as "an analysis of the factual matters that make up the gist of the complaint, without regard to the form of action." *Barr*, 837 S.W.2d at 630; *Bd. of Adjustment of City of Dallas v. Billingsley Family Ltd.*, 442 S.W.3d 471, 475 (Tex. App.—Dallas 2013, no pet.). "This determination should be made 'pragmatically, "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a trial unit conforms to the parties' expectations or business understanding or usage."'" *Van Duzer*, 995 F. Supp. 2d at 686 (quoting *Daccach*, 217 S.W.3d at 449 (quoting *Barr*, 837 S.W.2d at 631)). "Any cause of action which arises out of those same facts should, if practicable, be litigated in the same lawsuit." *Barr*, 837 S.W.2d at 630.

In this case, TNIG's claims against Associates in the Initial Suit and in the Montgomery County Suit initially involved only TNIG's claims arising out of an alleged oral agreement which governed each and every sale by TNIG of a partial to Associates in loans and contracts for deed. TNIG's list of the loans and contracts for which TNIG was specifically asserting claims included all twenty-one of the loans and contracts in this case, save and except the Brooks Loan and the O'Riley Contract. As pointed out by Associates, those claims put in issue each sale of a partial by TNIG to Associates, each of the individual Participation Agreements by which partials were sold to Associates and which TNIG claimed were modified by the alleged oral agreement, and each of the loans and contracts for deed which were the subjects of those partials.

Additionally, the claims added by TNIG in the Third Petition support the conclusion that its claims in this case arise out of the same subject matter as the claims asserted in the Montgomery County Suit. In the Third Petition, TNIG claimed that Associates breached

individual Participation Agreements for over 150 partials (including eighteen of the twenty-one partials at issue in this case). In this suit, TNIG maintains that Associates breached the same individual Participation Agreements.[8] Moreover, through the exercise of diligence, TNIG could have and should have asserted claims regarding the three additional partials TNIG sold to Associates (the Brooks Loan, the O'Riley Contract, and the White Loan).

First, the O'Riley Contract was governed by the Fuentes-O'Riley-Martin-Wellik-Sherman Participation Agreement, which sets forth the terms of Associates' purchases of partials in the Fuentes Contract, the Wellik Contract, the Martin Contract, the Sherman Contract, the O'Riley Contract, and several others. TNIG asserted claims in the Montgomery County Suit for breach of that same Participation Agreement with regard to the Fuentes Contract, the Martin Contract, the Wellik Contract, the Sherman Contract, and numerous others, including at least three partials for which TNIG presented evidence at trial in the Montgomery County Suit. Thus, TNIG's claims regarding the O'Riley Partial, the Fuentes Partial, the Martin Partial, the Sherman Partial, and the Wellik Partial are based upon the identical contract as claims that were asserted in and actually tried in the Montgomery County Suit.

Additionally, as further support for the proposition that the claims here arise from the same subject matter as those asserted in the Montgomery County Suit, Associates points to the "per file" formula for the damages sought by TNIG in the state court for breach of the individual Participation Agreements and for conversion. The damage calculations in the state case appear

---

[8] The list attached to the Third Petition identifies by buyer/borrower name the loans and contracts in which TNIG sold partials to Associates and which are the subject of the individual Participation Agreements allegedly breached by Associates. That list includes eighteen of the twenty-one partials at issue here. Only the Brooks Loan, the O'Riley Contract, and the White Loan are missing from Exhibit "A" to the Third Petition.

to be identical to the "per file" formula set forth in TNIG's Answers to Interrogatories identifying the damages sought by TNIG in this case.

Moreover, although on January 23, 2012, TNIG filed a Notice of Partial Nonsuit Without Prejudice[9] with regard to fifteen of the twenty-one partials at issue here (listed on an attached "Exhibit A"), TNIG nonsuited *only* the breach of contract claims—not the companion conversion claims for those partials.[10] *See Lafayette Escadrille, Inc. v. City Credit Union*, No. 05-11-01439, 2013 WL 1932861, at *2 (Tex. App.—Dallas May 9, 2013, no pet.) ("When there is a legal relationship, such as under a lease or contract, all claims arising from that relationship arise from the same subject matter."); *see also Twyman v. Twyman*, 855 S.W.2d 619, 625 (Tex. 1993) ("Resolving both the tort and divorce actions in the same proceeding avoids two trials based at least in part on the same facts, and settles in one suit all matters existing between the parties.") (internal quotations omitted); *Robinson v. Garcia*, 5 S.W.3d 348, 350-51 (Tex. App.—Corpus

---

[9] The court recognizes that "[g]enerally, the taking of a voluntary nonsuit does not resolve the issues in the case and does not prejudice the parties against seeking the same relief in a subsequent lawsuit." *Thompson v. Weaver*, 429 S.W.3d 897, 903 (Tex. App.—Tyler Apr. 30, 2014, no pet.) (citing *Aetna Cas. & Sur. Co. v. Specia*, 849 S.W.2d 805, 806 (Tex. 1993)). "A voluntary nonsuit, however, may be subject to res judicata." *Thompson*, 429 S.W.3d at 903 (citing *McGowen v. Huang*, 120 S.W.3d 452, 462 n.6 (Tex. App.—Texarkana 2003, pet. denied); *Antonini v. Harris Cnty. Appraisal Dist.*, 999 S.W.2d 608, 614-15 (Tex. App.—Houston [14th Dist.] 1999, no pet.); *Jones v. Nightingale*, 900 S.W.2d 87, 90 (Tex. App.—San Antonio 1995, writ ref'd)); *see also Jordan v. Bustamante*, 158 S.W.3d 29, 36 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (recognizing that abandoning a cause of action pursuant to Texas Rule of Civil Procedure 165 can have res judicata effect). As mentioned above, TNIG did not nonsuit its related conversion claims based on the same subject matter as the breach of contract claims asserted here and, although it appears that TNIG did not put on evidence as to all conversion claims asserted in the Montgomery County Suit, the state judge made a global finding that "Associates did not convert any property belonging to TNIG" and that "Associates did not wrongfully exercise any dominion or control over any property of TNIG."

[10] Included in the list of fifteen are the White Loan and the O'Riley Contract.

Christi 1999, pet. denied) (both claims should have been tried together as they arose from representation in the same case even though distinct injuries and improper conduct were alleged).

In short, the record establishes that the state court entered a final judgment in the Montgomery County Suit and that TNIG filed a second suit involving the same parties alleging claims which could have been raised in the first action under the transactional approach and some claims arising from the same subject matter that were actually brought. Specifically, each of the claims with respect to the twenty-one partials could have been brought in the Montgomery County Suit. Moreover, TNIG expressly asserted claims for conversion arising out of the individual Participation Agreements for eighteen of the twenty-one and effectively asserted claims for twenty out of the twenty-one. Based on these facts, the court finds that Associates is entitled to summary judgment as to these claims on the basis of res judicata.[11]

C.     Breach of Contract

Under Texas law, the essential elements of a breach of contract claim are:

(1) the existence of a valid contract;

(2) the plaintiff performed or tendered performance;

(3) the defendant breached the contract; and

(4) the plaintiff was damaged as a result of the breach.

---

[11] TNIG's pending appeal does not affect the application of res judicata. *See Amedisys, Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 516 (Tex. 2014) ("Texas law affords final judgments res judicata effect even during the pendency of an appeal."). Moreover, according to Associates, the appeal issues do not impact the application of res judicata here because they are limited to the following: (i) a procedural issue with regard to Associates' motion for summary judgment on TNIG's oral agreement claims; (ii) whether the tender was effective to eliminate any claim by TNIG for attorney's fees or interest; and (iii) whether Associates was entitled to offset TNIG's recovery of a portion of the tendered funds by a portion of the attorney's fees incurred by Associates following its Rule 167 offer.

*Triton 88, L.P. v. Star Elec., LLC*, 411 S.W.3d 42, 56 (Tex. App.—Houston [1st Dist.] 2013, no pet.); *Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex. App.—Amarillo 2009, pet. denied); *Bank of Tex. v. VR Elec., Inc.*, 276 S.W.3d 671, 677 (Tex. App.—Houston [1st Dist.] 2008, no pet.). A breach occurs when a party fails or refuses to perform an act that it has expressly promised to perform. *See Franconia Assocs. v. United States*, 536 U.S. 129, 142-43 (2002); *AMS Constr. Co. v. K.H.K. Scaffolding Houston, Inc.*, 357 S.W.3d 30, 41 (Tex. App.—Houston [1st Dist.] 2011, pet. dism'd); *Hoss v. Alardin*, 338 S.W.3d 635, 650 (Tex. App.—Dallas 2011, no pet.).

When a promise is subject to a condition precedent, however, there can be no breach of contract until such condition or contingency is performed or occurs. *See Tex. Delta Mech., Inc. v. Republic Underwriter's Ins. Co.*, No. 05-0-00940, 2011 WL 2572492, at *3 (Tex. App.—Dallas June 30, 2011, no pet.); *T.F.W. Mgmt., Inc. v. Westwood Shores Prop. Owners Ass'n*, 162 S.W.3d 564, 570 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *Broughton Assocs. Joint Venture v. Boudreaux*, 70 S.W.3d 324, 328 (Tex. App.—Waco 2002, no pet.); *De La Morena v. Ingenieria E Maquinaria De Guadalupe, S.A.*, 56 S.W.3d 652, 656 (Tex. App.—Waco 2001, no pet.). "'A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation.'" *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (quoting *Centex Corp. v. Dalton*, 840 S.W.2d 952, 956 (Tex. 1992) (citing *Hohenberg Bros. v. George E. Gibbons & Co.*, 537 S.W.2d 1, 3 (Tex. 1976))); *accord Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 412 (5th Cir. 2009). A party does not breach a contract by failing to perform if a condition precedent to its performance has not occurred. *See Sharifi v. Steen Auto., LLC*, 370 S.W.3d 126, 144 (Tex. App.—Dallas 2012, no

pet.). Hence, failure to satisfy a condition precedent generally results in no liability for either party to the contract. *Centex Corp.*, 840 S.W.2d at 956.

In order to determine whether a condition precedent exists, the intention of the parties must be ascertained, and that can be done only by looking at the entire contract. *See Interstate Contracting Corp. v. City of Dallas*, 407 F.3d 708, 727 (5th Cir. 2005) (citing *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990)). "Typically, terms such as 'if,' 'provided that,' 'on condition that,' or similar terms must be used in the contract to support finding a condition precedent." *Id.*; *see Solar Applications Eng'g, Inc.*, 327 S.W.3d at 109; *McMahan v. Greenwood*, 108 S.W.3d 467, 484 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *Cal-Tex Lumber Co. v. Owens Handle Co.*, 989 S.W.2d 802, 809 (Tex. App.—Tyler 1999, no pet.). "'While there is no requirement that such phrases be utilized, their absence is probative of the parties' intention that a promise be made, rather than a condition imposed.'" *Solar Applications Eng'g, Inc.*, 327 S.W.3d at 109 (quoting *Criswell*, 792 S.W.2d at 948)). "In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible, when the intent of the parties is doubtful, or when a condition would impose an impossible or absurd result." *Thedford Crossing, L.P. v. Tyler Rose Nursery, Inc.*, 306 S.W.3d 860, 869 (Tex. App.—Tyler 2010, pet. denied) (citing *Criswell*, 792 S.W.2d at 948). "'Because of their harshness in operation, conditions are not favorites of the law.'" *Sharifi*, 370 S.W.3d at 144 (quoting *Criswell*, 792 S.W.2d at 948).

Strictly speaking, under Texas law, a "[f]ailure to meet conditions precedent is not an 'affirmative defense'" on which the defendant bears the burden of proof. *Lidawi v. Progressive Mut. Ins. Co.*, 112 S.W.3d 725, 729 n.1 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord*

*Bank of Am., N.A. v. Eisenhauer*, No. 13-09-00004, 2010 WL 2784031, at *8 (Tex. App.—Corpus Christi July 15, 2010, no pet.). Rather, "'[a] condition precedent to the right to maintain an action must be performed and "the fact of performance or excuse of nonperformance must be alleged and proved in order to warrant a recovery."'" *Lidawi*, 112 S.W.3d at 729 n.1 (quoting *Trevino v. Allstate Ins. Co.*, 651 S.W.2d 8, 11 (Tex. App.—Dallas 1983, writ ref'd n.r.e.) (quoting *Sw. Associated Tel. Co. v. City of Dalhart*, 254 S.W.2d 819, 825 (Tex. Civ. App.—Amarillo 1952, writ ref'd n.r.e.))). "'When a plaintiff avers generally that all conditions precedent have been performed, he is required to prove the performance of only those conditions precedent specifically denied by the defendant.'" *Lidawi*, 112 S.W.3d at 729 n.1 (quoting *Trevino*, 651 S.W.2d at 11). "'The effect of this rule is to shift the burden of pleading to the defendant, but not the burden of proof, when the plaintiff has made a general allegation that all conditions precedent have been performed.'" *Lidawi*, 112 S.W.3d at 729 n.1 (quoting *Trevino*, 651 S.W.2d at 11).

In the case at bar, the Deed of Trust Participation Agreement form used in the agreements in this case states that "[s]hould Borrower or someone on behalf of Borrower, make all payments owed to the 'Associates,' either pursuant to the payment schedule or otherwise, then the 'Associates' shall execute an absolute assignment of the Mortgage and Note to owner and advise Borrower(s) to make all future payments to Seller." *See* Docket No. 39 (Zissis Aff. ¶ 9, Ex. B-6); *see also* Docket No. 26 (Second Amended Complaint ¶ 2.01) ("After Associates collected the number of payments purchased from TNIG, Associates was to transfer the remaining balance to TNIG if Associates did not purchase the balance."). While the Agreements for Purchase of a Participation in an Installment Land Sales Contract form does not contain a provision expressly

requiring the assignment upon a payout of the partial, they provide that "[a]ll funds received by Associates over and above its entitlement . . . shall be the property of seller and shall be paid over to seller." *See* Docket No. 39 (Zissis Aff. ¶ 9, Ex. B-5); *see also* Docket No. 26 (Second Amended Complaint ¶ 2.01). Based on the language of the Participation Agreements, Associates has no obligation to assign the remaining payments to the owner or to pay over excess funds until it receives all payments due under the contract.

The summary judgment evidence cited by Associates—which is wholly uncontested by TNIG—conclusively establishes that for seventeen of the twenty-one partials, Associates did not receive all of the payments it was due. Specifically, Associates did not collect all of the payments under the partials for the (1) Brooks Loan, (2) the Brownell Loan, (3) the Carrillo Loan, (4) the Ellenberg Loan, (5) the Ferrera Loan, (6) the Fischer Contract, (7) the Foster Loan, (8) the Hutton Contract, (9) the Martin Contract, (10) the Mayberry Contract, (11) the Morehead/Burke Loan, (12) the Noonan Loan, (13) the O'Riley Contract, (14) the Reed Loan, (15) the Rodriguez Loan, (16) the Underwood Loan, (17) or the Wellik Contract. Indeed, most of these accounts went into default. After notice was provided to TNIG and it failed to repurchase the loan or contract or cure the default, either: (i) the property was foreclosed upon and the proceeds were insufficient to satisfy Associates' guaranteed minimum yield (such that there was no excess amount or remainder to be paid to TNIG); or (ii) the note or contract for deed was charged off because the value of the property securing the loan or which was the subject of the contract was insufficient to justify a foreclosure.[12] *See* Docket Nos. 39 & 40 (Zissis Aff.; Runnels Aff.). Additionally, TNIG points

---

[12] With regard to the Morehead/Burke Loan, the undisputed evidence demonstrates that, after TNIG was notified of title problems with the Morehead/Burke Loan and the absence of a valid lien and TNIG failed to repurchase the loan or cure the title issues, the loan was charged off on June 5, 2002. *See*

to no record evidence suggesting that Associates received of all of the payments under these partials or for the Fuentes and Sherman Contracts. As a consequence, Associates is entitled to summary judgment on TNIG's breach of contract claims as to the nineteen partials discussed above.

With regard to the remaining two breach of contract claims—those pertaining to the Joshua Brooke Loan and the White Loan—Associates is also entitled to summary judgment because there is no evidence of a breach of contract on the part of Associates (*i.e.*, there is no evidence that Associates failed to forward excess funds or reassign alleged remainder interests to TNIG). First, the Joshua Brooke Loan was paid off in full through a refinancing such that the loan was satisfied and there was no remainder interest to reassign to TNIG (or any other entity). In fact, Associates was never in possession of any excess funds belonging to TNIG. *See* Docket No. 39 (Zissis Aff. ¶ 15).[13] Moreover, the Participation Agreements contain a provision specifically addressing the calculation of the portion of the payoff which Associates is entitled to retain and the excess to be paid to the remainder owner. *See* Docket No. 39 (Zissis Aff., Ex. B-6).

Second, the uncontested evidence submitted by Associates establishes that Speed (rather than TNIG) owned the remainder interest in the White Loan and that upon the payout of Associates' partial, Associates assigned the loan to Speed in accordance with the terms of the White Participation Agreement. *See* Docket No. 40 (Runnels Aff. ¶ 19, Ex. C-20). As a result, Associates is entitled to summary judgment on this claim.

---

Docket No. 40 (Runnels Aff. ¶ 14).

[13] In this particular situation, the evidence submitted by Associates establishes that the Joshua Brooke Loan was refinanced by the borrower, and TNIG's seller, Metro, received the full payoff for the Joshua Brooke Loan on or about January 2, 2001, inclusive of the amounts owed to Associates for its partial and the excess belonging to TNIG. *See* Docket No. 39 (Zissis Aff. ¶ 15).

In short, there is no record evidence that Associates breached the Participation Agreements at issue in this case by failing to assign alleged remainder interests to TNIG. Consequently, Associates is entitled to summary judgment on TNIG's breach of contract claims for each of the twenty-one partials asserted in this case.

     D.    <u>Statute of Limitations</u>

The purpose of the statutes of limitations is to compel plaintiffs to assert their claims "'within a reasonable period while the evidence is fresh in the minds of the parties and witnesses.'" *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734 (Tex. 2001) (quoting *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996)); *see Murray v. San Jacinto Agency, Inc.*, 800 S.W.2d 826, 828 (Tex. 1990); *Medina v. Tate*, 438 S.W.3d 583, 598 (Tex. App.—Houston [1st Dist.] 2013, no pet.).

In a diversity case such as this, in which the causes of action arise under Texas law, federal courts apply Texas statutes of limitation, along with any accompanying rules regarding accrual and tolling. *See Milton v. Stryker Corp.*, 551 F. App'x 125, 127 (5th Cir. 2014); *Priester v. JP Morgan Chase Bank, N.A.*, 708 F.3d 667, 672 (5th Cir. 2013); *Citigroup Inc. v. Fed. Ins. Co.*, 649 F.3d 367, 373 (5th Cir. 2011). It is the defendant's burden to establish the affirmative defense of limitations, including the accrual date of the plaintiff's claims. *Schouest v. Medtronic, Inc.*, 13 F. Supp. 3d 692, 708 (S.D. Tex. 2014); *Cont'l Cas. Co. v. Dr. Pepper Bottling Co.*, 416 F. Supp. 2d 497, 506 (N.D. Tex. 2006) (citing *Ingersoll-Rand Co. v. Valero Energy Corp.*, 997 S.W.2d 203, 211 (Tex. 1999)); *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005). The date of accrual of a cause of action is a matter of substantive law. *See TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 355 (5th Cir. 2008); *In re Gleasman*, 933 F.2d 1277, 1281

(5th Cir. 1991); *Hunt Oil Co. v. Live Oak Energy, Inc.*, 313 S.W.3d 384, 387 (Tex. App.—Dallas 2009, pet. denied). "'The accrual of a cause of action means the right to institute and maintain suit, and whenever one person may sue another a cause of action has accrued.'" *Crane v. Richardson Bike Mart, Inc.*, 295 S.W.3d 1, 4-5 (Tex. App.—El Paso 2009, no pet.) (quoting *Luling Oil & Gas Co. v. Humble Oil & Ref. Co.*, 191 S.W.2d 716 (Tex. 1945)).

Generally, in Texas, "a cause of action accrues when a wrongful act causes a legal injury, regardless of when the plaintiff learns of that injury or if all resulting damages have yet to occur." *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 (Tex. 2003) (citing *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996)); *see Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 348 S.W.3d 194, 202 (Tex. 2011); *Holland v. Thompson*, 338 S.W.3d 586, 593 (Tex. App.—El Paso 2010, pet. denied); *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 622 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). "A breach of contract claim accrues when the contract is breached." *Santander Consumer USA, Inc. v. Palisades Collection, LLC*, 447 S.W.3d 902, 906 (Tex. App.—Dallas 2014, pet. filed) (citing *Stine v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002)).

In Texas, the statute of limitations for breach of contract is four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.051 (breach of contract); *Stine*, 80 S.W.3d at 592 (noting a four-year statute of limitation for breach of contract claims); *Ingersoll-Rand Co.*, 997 S.W.2d at 210 n.37 (holding a four-year statute of limitation applies to breach of contract claims); *Dunmore v. Chicago Title Ins. Co.*, 400 S.W.3d 635, 640 (Tex. App.—Dallas 2013, no pet.) (same).

TNIG did not file the instant lawsuit until July 26, 2012. Therefore, any cause of action that accrued on or before July 26, 2008, is time-barred. Here, the record evidence reveals that TNIG's claims regarding the O'Riley Partial, the Joshua Brooke Partial, the Brooks Partial, the

38

Brownell Partial, the Carrillo Partial, the Ellenberg Partial, the Ferrera Partial, the Foster Partial, the Fischer Partial, the Hutton Partial, the Martin Partial, the Mayberry Partial, the Morehead/Burke Partial, the Reed Partial, the Rodriguez Partial, the Underwood Partial, and the Wellik Partial accrued prior to July 26, 2008.

First, the uncontested evidence demonstrates that TNIG was aware that the Joshua Brooke Partial had been paid in full and that Associates collected the full amount of the partial no later than March 5, 2001. Consequently, any claim arising out of the Joshua Brooke Partial and any failure by Associates to assign the remainder or pay excess proceeds to TNIG became time-barred on March 5, 2005, at the latest.

The evidence also demonstrates that TNIG received notice of defaults under the O'Riley Contract, as well as Associates' intention to foreclose on the O'Riley Property, and TNIG's obligation either to repurchase the contract or cure the defaults by letter dated March 28, 2003. When TNIG failed to do either, the O'Riley Property was sold at a foreclosure sale on November 2, 2004. Therefore, limitations on any claim based upon the O'Riley Partial accrued on or before November 2, 2004, and became time-barred on or before November 2, 2008.

Similarly, a deed in lieu of the Ferrera Property was recorded in July 2001. Additionally, the Ellenberg, Rodriguez, and Wellik Properties were sold at foreclosure in August 2001, the Hutton Property was sold at foreclosure in October 2001, the Brownell Property was sold at foreclosure in December 2001, the Foster Property was sold at foreclosure in February 2003, and the Brooks Property was sold at foreclosure on June 3, 2008. Further, with the exception of the Brooks Partial, each of the aforementioned partials pertaining to the foreclosed properties was the subject of claims asserted by TNIG when it first filed the Initial Suit on October 18, 2006. As a

result of the foreclosures, TNIG had actual, or at minimum, constructive notice that there was no remainder to be reassigned to TNIG more than four years before July 26, 2012, such that TNIG's claims are time-barred.

TNIG also received notices of default, Associates' intention to foreclose, and TNIG's obligation to repurchase the loan or contract or to cure the defaults more than four years prior to July 26, 2012, for the Carrillo Loan, the Fischer Contract, the Martin Contract, the Mayberry Contract, the Reed Loan, and the Underwood Loan. Consequently, TNIG knew or should have known that there would be no payout of the partial or reassignment of any alleged remainder interest. Further, in February 2002, TNIG was made aware of the title issues with regard to the Morehead/Burke Loan, which essentially caused the loan to become uncollectible. Moreover, TNIG asserted claims for each of the foregoing partials in the Initial Suit filed on October 18, 2006. In sum, TNIG's claims regarding each of the foregoing transactions are time-barred.

III.    Conclusion

Consistent with the foregoing analysis, Associates' motion for summary judgment is GRANTED. TNIG's claims are foreclosed by the doctrine of res judicata, the failure to demonstrate a breach of contract on the part of Associates, and the applicable statute of limitations. TNIG fails to present a claim that warrants relief. There remain no material facts in dispute, and Associates is entitled to judgment as a matter of law.

SIGNED at Beaumont, Texas, this 16th day of March, 2015.

_Marcia A. Crone_
_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE